## THE WILLIAM S. KIRBY.

### (District Court, E. D. Virginia. July 30, 1908.)

COLLISION—SCHOONER GOING ADRIFT IN STORM—LIABILITY FOR COLLISION.

A schooner, loaded with lumber, made fast to Pier A Newport News, while unloading, was broken loose in the night by an unusually severe storm. The evidence showed that she was properly fastened and well manned, and that her crew did everything possible to hold her. After going adrift, her breast chain caught on a pile at another pier, where she was held, being unable in the storm to get loose, and she was also more securely made fast by the crew. She rode safely until 9 o'clock in the morning without danger to herself or to other vessels, but at that time, the tide having turned, there became danger of collision between her and two launches fastened to such pier, and at about 1 o'clock such collisions occurred, in which the launches were injured. It appeared that those on

board did all that was possible to protect their respective vessels, but that, owing to the severity of the storm, libelant, who was the owner of the launches, was unable to get out to them to render assistance or remove them. *Held*, under the evidence, that the schooner was chargeable with no fault which rendered her liable for the damage, but the loss must be attributed to the unusual weather conditions and borne by libelant.

In Admiralty. Suit for collision.

Ashby & Read, for libelant.

Riddleberger & Roper, for respondent.

WADDILL, District Judge. This libel is to recover damages caused by a collision which occurred on the 24th day of January, 1908, in the harbor of Newport News, Va., between the schooner William S. Kirby and two launches owned by the libelant, while all were lying at the breakwater pier. The collision was of an unusual character. All the evidence in the case, which was considerable, was taken orally before the court, and involved three questions: First, the cause of the original breaking loose of the Kirby from the pier to which she was moored; second, the conduct of her officers and crew after she broke loose, while adrift; and third, the manner of her anchorage, and the conduct of her officers after her anchorage. It appears that the schooner, loaded with lumber, was made fast to the southern or eastern side of Pier A, at Newport News, for unloading, and on the night in question a severe storm arose, on account of which she broke loose from her mooring and was turned adrift. The schooner was properly manned and equipped, among other things, with a hawser 240 feet long. It is undisputed that she was made fast to the pier properly, and in the usual manner, for the purpose of unloading. When the storm arose, those in charge of the schooner endeavored to fasten her to the wharf more securely, and used every means at hand to accomplish that end. The storm was an unusual one, coming from a point which greatly endangered vessels at anchor or fastened to Pier A, and while so moored by ropes fastened to cleats on the schooner, and thence run to cleats on the pier, the starboard beam cleat of the vessel broke away, or was drawn out, and immediately the crew got the lines clear, and made them fast around the samson post to hold the boat. This post, which was to all exterior appearances sound, after awhile snapped off right close to the deck, casting loose all the ropes wound round it. This second breaking resulted in the vessel's tearing loose forward, and finally, owing to the terrific storm then prevailing, and which continued unabated, she broke away aft. Every effort was made to add to and strengthen the remaining ropes to hold her in position; but in a storm of that severity, with a boat laden as she was, and fastened aft and not forward, the strain was too great, which caused the hawser to snap. Considerable testimony was adduced as to the quality of the ropes used in making fast to the pier, and to the samson post; but the same has no special weight here, because it was not the rope, but the samson post, which broke, from what might be termed a latent, rather than a patent, defect. There was some evidence, also, that the post was set in and fastened to the deck

of the vessel, instead of to the keel; but that contention is not sustained, the preponderance of the testimony being that the same was placed as they usually are—that is, through the deck to the keel of the vessel. The court's conclusion is, upon the facts and circumstances of this case, that the Kirby should not be held responsible for the effects of a storm which broke the vessel from her mooring.

As to the collision which happened next day about noon, after various other causes had intervened, which in the opinion of the court were the direct cause of the accident, the question is: Did the schooner do anything to cause injury to other vessels after she got adrift for which she should be held liable? There was only a very short drift before the vessel was again made fast. The undisputed testimony is that her crew immediately threw her anchor out. Whether it dragged or not is not material, because by the turning of the vessel after she broke loose from Pier A she curiously enough got hung up by the breast chain of her bowsprit catching over the end of the piles in front of the breakwater, and that stopped her drift. Such an intervention would not happen often. It was one of the mysterious things which sometimes occur. Here was a vessel lashed to Pier A, and properly and safely made fast, suddenly turned adrift, and her breast chain catches over in another pier, holding the schooner taut, so that it withstood and rode out a long continued and unusually severe storm. She was thus suspended by this chain from 3 or 4 o'clock in the morning, until the following day at 9 o'clock, without anything being injured or endangered from her position. After being caught in this position, those in charge of her made fast also to one of the stanchions of the breakwater, which the court thinks was an act of prudence. The schooner was apparently not in a position to hurt other craft; and thus fastening her helped to make the vessel safer, and prevent it from again breaking loose, and drifting into shipping in the harbor. In the view taken by the court, the real cause of the damage arose from the fact that the launches were in too close proximity to the schooner thus suspended by her chain to the pier and made fast to the stanchion. From 4 o'clock to 9 o'clock that morning there was no danger to any vessel. At 9 o'clock, the tide having turned, the two small boats, for damage to which this libel is filed, and the government boat, were all in a position of danger; but during the morning the government boat was taken out by a number of men, leaving libelant's two launches there. This dangerous condition continued until about 1:30 in the afternoon, when the two launches were also gotten out; they having in the meantime received the injuries sued for.

The real question to be determined is whether the damage to the small boats, brought into close proximity to and dashed against the schooner by the action of a violent storm, as before described, should be paid by the owner of the Kirby, or should fall upon the owner of the launches; and to ascertain this the court has to take into consideration all the facts and circumstances surrounding the entire matter, and the obligations all parties interested owed to each other to do their full duty so as not to damage each other's property. It may be

163 F.—50

conceded that, unless those in charge of the Kirby neglected to do something which they ought to have done after the little boats got in a position of danger from fouling or colliding with the Kirby, then, clearly, the owner of the Kirby would not be liable. The serious danger to these launches did not arise until 9 o'clock in the morning. Their owner knew of the danger at that time, as did the master of the Kirby. It was patent after the tide turned, and from the force of the wind which threw the vessels together. They were not only presumed to know of it, but they actually knew it. The crew of the Kirby, the government officer in his boat, and Mr. Spencer, were all trying to do the best they could to protect their respective boats and to aid each other in securing them, and from 9 o'clock in the morning until 1 o'clock in the afternoon their perilous position was manifest to everybody present.

Unquestionably the officers and crew of the Kirby owed their first duty to the protection of their own vessel. They were not in their then position by their own choice, but by the violence of the storm prevailing. They did not anchor in this position, and as a matter of fact, at the time the vessel was driven there, there was no danger, and, having been caught by the breast chain, they were powerless to extricate themselves, and were at the mercy of the wind and tide. After the danger developed at 9 o'clock in the morning, every one did what they thought proper and believed to be best for their safety and relief, and it is hard to realize that in the city of Newport News, a port of considerable extent and large shipping, there was no seaman or other person obtainable who had skill sufficient to get out these launches; but the fact that it was not done leads the court to assume that it was not possible to do it, and that Mr. Spencer had exhausted every remedy in his power to save his property. The weather was too severe for him to go out on the breakwater. He tried to get there on his hands and knees, but could not proceed on account of the ice and sleet, and there was no other way apparently, certainly without a boat, for him to get to his launches, that he could devise. But it does not follow that because he was in this unfortunate predicament, and his property in peril, the loss subsequently accruing should fall on the owner of the schooner, rather than on himself. The court does not think there was any negligence between 9 and 1 o'clock on the part of the persons in charge of the Kirby to justify visiting the loss sued for upon the Kirby, as distinguished from the owner of the boats which were damaged. The crew of the Kirby owed their first duty to their own vessel, though it does not appear there was much they could have done to save the launches, in the circumstances. The Kirby and the launches were both in danger, and they took no risk in attempting to help others, but devoted their attention to their own ship. Any other course might have been disastrous to both, and, in any event, they so acted in such an emergency, and should not be held responsible, under the circumstances, for what, at best, would be but an error of judgment. Mr. Spencer was surrounded by his friends, and to expect the crew of the Kirby to do more than Mr. Spencer could for his own property would be to impose upon them a burden

 which the law does not require. In other words, it is simply a question in this case, upon whom the loss shall fall; and in the opinion of the court it should stay where it fell, on the owner of the launches.

A decree may be entered dismissing the libel, with costs.